**Kenneth D. COLBURN, Robert Khoury, Plaintiffs,**

v.

**TRUSTEES OF INDIANA UNIVERSITY, et al., Defendants.**

**No. IP87–430–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

May 15, 1990.

Richard L. Darst, Mantel Cohen Garelick Reiswerg & Fishman, Indianapolis, Ind., for plaintiffs.

Gregory J. Utken, Hudnall A. Pfeiffer, Baker & Daniels, Indianapolis, Ind., for defendants.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This is a civil rights action in which two former Indiana University Assistant Professors seek relief for the defendants' actions in not reappointing them for continued employment, not promoting them to the rank of Associate Professor, and not awarding them tenure. The cause comes

before the Court on the defendants' motion for summary judgment. The motion raises a number of difficult and important issues that require an extensive discussion to resolve. For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART the motion. Further orders of the Court are detailed at the end of this opinion.

## I. FACTS

Initially, it must be noted that the undisputed material facts relayed below are largely taken from those supplied by the defendant. Under Local Rule 11, the summary judgment movant must file a statement of material facts as to which there is no genuine issue. The defendants have done that in this case, and a review of the record shows that, while not entirely complete, the defendant's facts are, with one exception discussed later in this opinion, generally accurate.[1]

Local Rule 11 then requires the non-movant to file a statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated. Although plaintiffs filed a three-page document that purports to be a statement of genuine issues of material fact, this document in actuality only sets forth issues of law. It does not make any challenge to the facts set forth by the defendants, but instead lists a number of legal issues, such as "Whether the speech of the plaintiffs addressed matters of public concern."

Thus, although the defendants have identified specific references in the record supporting their facts, the plaintiffs have merely filed lengthy depositions and binders containing numerous documents without any specific indication of what portions contradict or supplant the defendants' version of the facts. It must be remembered that it is the advocates, not the courts, who

must press their claims and vigorously oppose the motion for summary judgment. *See, e.g., Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989) (courts need not scour record to support a party's claim at summary judgment; adversaries are to pursue their cases and courts are to rule accordingly). Local Rule 11 simply reiterates this maxim.

Thus, in this instance the plaintiffs have not followed the appropriate procedures to challenge any of the facts relayed by the defendants. Accordingly, except where the Court's own review of the record has brought to light additional relevant material facts,[2] this Court will similarly accept the defendants' facts, take them favorably for the non-movant plaintiffs, and focus solely on the legal arguments raised. The facts that set the framework for the legal analysis are set forth. As will be seen, given the nature of this case and number of issues raised, it is necessary to fully delineate the facts relevant to this motion.

### A. The Parties:

Plaintiff Kenneth D. Colburn, Jr., is a citizen of the State of Indiana. Plaintiff Robert M. Khoury is a citizen of the State of Georgia. Colburn and Khoury were faculty members in the Department of Sociology at Indiana University in the late 1970s and early 1980s. The Board of Trustees of Indiana University is the statutorily-created entity charged with administering the University.

The individual defendants are officials of Indiana University. The positions they held at the University's Indianapolis campus at times material to this action are as follows:

a. Glenn W. Irwin, Jr. — Vice President of Indiana University at Indianapolis
b. Howard G. Schaller — Executive Dean and Dean of Faculties
c. William M. Plater — Dean of the School of Liberal Arts

---

1. The defendants' version of the facts is exhaustive and generally well presented. As will be seen, though, there are some additional material facts that need to be considered for a proper evaluation of some aspects of this multi-issue summary judgment motion.

2. Although not necessary in this setting, the Court has nonetheless proceeded to give the record a full review in order to ensure that today's ruling is based on all rather than some of the merits.

d. Richard O. Hope — Chairperson of the Department of Sociology
e. John T. Liell — Professor in the Department of Sociology and Chairperson of the Department's Primary Committee in 1983–84
f. Linda Hass — Associate Professor, Department of Sociology and Chairperson of the Department's Primary Committee in 1984–85.

## B. *The Plaintiffs' Employment:*

Colburn and Khoury were hired by the University in 1979 in the Sociology Department as probationary tenure track faculty. Both Colburn and Khoury received and signed a standard form from the University at the time of their initial appointment as Assistant Professors. These documents state that their appointment was for a "tenure probationary period," and recite that with "continued full-time service in rank at Indiana University ..., a tenure decision will be made no later than [a certain date]."

The notices also recite that "persons accepting offers ... are to be notified in writing of the terms of the appointment, and of criteria and procedures relating to reappointment and the awarding of tenure." Above the appointees' signature, the form provides:

> I agree to the terms of this appointment.... I have read and agree to the criteria and procedures employed in recommendations and decisions about reappointment and the awarding of tenure at Indiana University and any special procedures customarily employed in the department, school, program, or division of the University in which my appointment is to be recommended.

These forms also state that the plaintiffs' appointment shall begin in August of the year in question and end the following summer, with reappointment to be decided before the end of the term of appointment.

Thereafter, Colburn received annual reviews and was reappointed each year as an Assistant Professor. Khoury similarly received annual reviews and was always reappointed until 1985.

Colburn's employment ceased at the end of the spring semester of 1986, when he declined the University's offer of a one-year terminal appointment. On August 23, 1985, Khoury resigned his employment after having been notified that he would not be reappointed after the 1985–86 academic year. Both plaintiffs contend they had enforceable contracts with the University consisting of their initial appointment documents, the University's Academic and Faculty Handbooks, and other rules, regulations, and policies distributed to them.

The Faculty and Academic Handbooks specifically distinguish between dismissal and non-reappointment. Non-reappointment occurs when the University decides not to reappoint a probationary professor after the expiration of his appointment period. Dismissal occurs when the University terminates a probationary professor during the term of his appointment.

Under the terms of the Faculty Handbook, the University may dismiss a probationary faculty member only for limited reasons. Specifically, dismissal "shall only occur for reasons of (a) incompetence, (b) serious or professional misconduct, or (c) extraordinary financial exigencies of the University." As for reappointment, though, the Faculty Handbook merely provides that the faculty member shall be advised at the time of the initial appointment of the "criteria and procedures employed in recommendations and decisions about reappointment...."

The Handbook further indicates that during the period of probationary appointment the faculty member shall receive an annual review and be informed of "all matters relevant to the eligibility for reappointment and the award of tenure." The Handbook then provides that the faculty member shall have certain procedural rights upon notice of a "negative recommendation or decision on reappointment."

As for promotion and tenure decisions, the Handbook and Department Bylaws provide criteria for deciding whether a non-tenured appointee should be promoted to a higher rank of professor or granted tenure.

"The criteria for tenure and the criteria for promotion are similar, but not identical."[3]

As to tenure, the Handbook initially states, "Subject to the provisions that follow, an individual appointed to the faculty ... for full-time service shall have tenure after a probationary period of not more than seven years." Later, in the "Criteria for Tenure" section, the Handbook contains the following provisions:

> After the appropriate probationary period, tenure shall be granted to those faculty members ... whose professional characteristics indicate that they will continue to serve with distinction in their appointed roles. The criteria for tenure must take into account the mission of the particular unit and the individual's contribution to that mission. Tenure will generally not be conferred unless the faculty member ... achieves, or gives strong promise of achieving, promotion in rank within the University.

The Handbook adds, "The tenure of any faculty member, however, is specific to the campus unit in which he ... is serving at the time of acquisition of tenure." "Consequently, it is the responsibility of each unit of the University to develop appropriate structures and administer the necessary procedures for the implementation of general University tenure policies." Beyond these brief passages, no further information is contained in the Handbook as to what is meant by the "general University tenure policies."

The Handbook does list some specific criteria for promotion. The more relevant provisions are set forth below:

**Criteria For Promotion**

Teaching, research and creative work, and services which may be administrative, professional, or public are long-standing University promotion criteria. Promotion considerations must take into account, however differences in mission between campuses, and between schools within some campuses, as well as the individual's contribution to the school/campus mission. The relative weight attached to the criteria above should and must vary accordingly. A candidate for promotion should normally excel in at least one of the above categories and be satisfactory in the others. Promotion to any rank is a recognition of past achievement and a sign of confidence that the individual is capable of greater responsibilities and accomplishments.

The Handbook then goes on to further describe methods by which the criteria of teaching, research and creative activities, and service are to be measured, and notes that the "individual should be assessed in regard to all three criteria...."

The Handbook then adds that "[f]avorable action should result when the individual has demonstrated a level of competence or distinction appropriate to the proposed rank in one area of endeavor." "Failure to promote," however, "may arise from unsatisfactory performance in the other areas." Finally, the Handbook offers additional guidance for each specific promotion, such as from Instructor to Assistant Professor, and from Assistant Professor to Associate Professor. The latter promotion, which is relevant here as both plaintiffs were Assistant Professors, "is based on continued improvement, whether in quality of teaching, in scholarship, or in the performance of service roles."

The Department of Sociology at IUPUI is also governed by its own By–Laws that were adopted in 1983. One section of those By–Laws lists the "Criteria for Reappointment, Tenure, and Promotion." These standards are similar to those for promotion listed in the University Handbook in

**3.** The plaintiff submitted the Indiana University Handbook and the IUPUI Handbook, while the defendants submitted only IUPUI's. A review of the two shows that the IUPUI Handbook is basically a replica of Indiana University's. Moreover, it is clear that the Indiana University Handbook also applied to the plaintiffs because it is undisputed that IUPUI is part of the Indiana University system, and, as the Indiana University Handbook states in its preamble, "The information, policies, and procedures set forth here apply to academic appointees on all campuses of the University." Thus, the Court will refer primarily to the system-wide Handbook.

that they involve teaching, research, and service. The preamble to the Department's criteria notes that Sociology is "a discipline in transition and undergoing development, redefinition, and revision." The preamble adds that these "guidelines are offered in the spirit of this recognition, and it is hoped that the Primary Committee will, in its review of individuals, seek to conserve and preserve this recognition."

A memorandum from the Dean of Faculties of IUPUI entitled "Notes Regarding Tenure Procedures" also speaks to tenure. This document provides in part:

> Primary committees should be reminded that one of the purposes of the annual review is to identify at the earliest possible date those faculty members who do not demonstrate the qualifications and abilities necessary to achieve tenure. A faculty member who is in an early year of service and is obviously unqualified for tenure should not be recommended for reappointment.

### C. *The Sociology Department:*

The structure of the Sociology Department is guided by the principle of peer review and peer governance. Faculty have input into the selection of the Chairperson of the Department, and faculty vote on the by-laws of the Department. The Department has a Primary Committee, which is the internal peer review group for annual reviews, promotions, and tenure decisions for faculty in the Sociology Department. The Primary Committee consists of faculty members who are elected by other faculty members by secret ballot. The Sociology Department selects its Primary Committee based on procedures its own faculty establishes. Colburn was a member of the Primary Committee for the 1982–83 academic year, and Khoury was an alternate member for the 1983 year.

Plaintiffs' claims arise out of a bitter internal conflict among faculty in the Sociology Department. Plaintiffs contend that in 1980 the Department became factionalized into two groups, and thereafter relationships between the two factions steadily and increasingly deteriorated. Plaintiffs

pinpoint the split in the Department as beginning in the spring of 1980 when there was an exchange of insults between then Chairperson Colin Williams and Professor John Liell.

Plaintiffs see this "heated blow-up" between the two individuals as pivotal, because they believe that Liell thereafter decided Williams would never again be on the Primary Committee and Liell would take control. Liell began to carry his personal conflict with Williams into the Department and suggested that plaintiffs would benefit from siding with Liell. Plaintiffs believed that their future from that point on depended upon how Liell responded to them.

Plaintiffs identified the Department's "them/us" factions as follows:

| "Them" | "Us" |
|---|---|
| John Liell | Brian Vargas |
| Ain Hass | Sue Hammersmith |
| Linda Hass | Colin Williams |
| Dave Ford | Kenneth Colburn |
| Tim Maher | Robert Khoury |
| Betty Lavine | |
| Joe Taylor | |
| David Moller | |

According to the plaintiffs, in May of 1984 Chairperson Hope also became a member of the opposing faction.

Plaintiffs contend that what made the "them" faction a group was that they shared a sense of who the enemies within the Department were, and they also had a sense of personal loyalty to each other that became their primary concern. Plaintiffs were asked to become involved in the opposing faction, but expressed different views and were thereafter treated differently.

### D. *The Primary Committee:*

The Sociology Department's Primary Committee "serves to evaluate faculty for reappointment, tenure, and promotion." Historically, the Primary Committee consisted of three members. In the fall of the 1983–84 academic year, however, the Sociology faculty unanimously voted to change the by-laws to increase membership to five in order to better represent the factions' differing views. The Primary Committee

members were still selected by majority vote of the faculty.

In March of 1984, plaintiffs and several other professors separately requested Executive Dean Schaller to have the University Tenure Committee conduct an external review of the Primary Committee. Dean Plater urged that the members of the Department try and work out their differences internally, and Executive Dean Schaller then deferred any review by the Tenure Committee.

Thereafter, Joseph Taylor, who was the Assistant to Vice President Irwin and an emeritus member of the Sociology Department, was appointed to meet with members of the Sociology Department to collect their different views in an effort to resolve the internal problems. On May 2, 1984, plaintiffs and other members of their faction submitted a proposal to reform the Department's Primary Committee. The proposal would have eliminated choosing Committee members by faculty vote. After Taylor received input from a variety of sources within the Department, Taylor made his own proposal which was also distributed to the Sociology faculty. By a vote of 7 to 0, with the plaintiffs and other members of their faction abstaining, Taylor's proposal was adopted by the Sociology Department.

At a September 1984 Department meeting, the Sociology faculty elected members of the Primary Committee for the upcoming academic year. John Liell, Linda Haas, Ain Haas, and David Moller, all members of the "opposing faction," were selected. The Department by-laws specified that there must be at least two full professors on the Primary Committee. Of those elected, only Liell was a full professor. At that time, the only other full professor in the Department was Williams, who was asked to participate on the Committee but declined to do so. Chairperson Hope then appointed Joseph Taylor, also from the opposing faction, to substitute for Williams.

E. *Facts Relevant to Colburn:*

1. Colburn's Request for Promotion:

Faculty members may either be nominated for promotion or put themselves up for promotion. By a memorandum dated September 26, 1984, Colburn put himself up for promotion and submitted a dossier in support of his request. Procedurally, a promotional candidate is reviewed within his department by the Primary Committee, then by the Department Chairperson, then by a Unit Promotion Committee, then by the Liberal Arts Dean, then by a campus-wide Promotion Committee, and finally by the Dean of Faculties and the Vice President. Apparently, the final decision then lies with the President and Trustees, but is usually delegated to Vice President Irwin. At each step, the candidate's dossier is reviewed, his teaching, research, and service are evaluated, and a recommendation is made. Because each committee is multi-membered and there are several committees, it is possible to have split votes within a particular committee and for the recommendation of one committee to differ with that of another.

After Colburn tendered his dossier, the Primary Committee requested certain additional information, and Colburn submitted a six-page response with attachments. On October 30, 1984, the Primary Committee unanimously recommended against Colburn's promotion, as did the Department Chairperson. The Unit Promotion Committee, however, recommended in favor of promotion.

On November 30, 1984, Dean Plater informed Colburn that he recommended against promotion. Plater provided Colburn with a draft of his recommendation in advance and offered Colburn the opportunity to submit any additional information relevant to the recommendation Plater was planning to make. Colburn submitted a six-page letter outlining his disagreement with the basis of Plater's recommendation. Plater included this in Colburn's dossier. On December 7, 1984, Plater made his formal recommendation against Colburn's promotion.

In February of 1985, the all-campus Promotions Committee recommended against promotion by a vote of 7 to 6. On March 14, 1985, Colburn was informed that the

final recommendation was against promotion.

On April 25, 1985, Colburn requested the Secretary of the Faculty Council to convene a Faculty Board of Review to hear his grievance about his non-promotion. The Board of Review's recommendation and Vice President Irwin's decision is discussed below after the facts of Colburn's non-reappointment are set forth.

2. Colburn's Non-reappointment:

Each year all probationary faculty are reviewed within the Department. An initial review and recommendation on continued employment is made by the Primary Committee. As a probationary faculty member, Colburn was subject to the annual review process. His prior reviews had resulted in reappointments each year. Because he had recommended himself for promotion in September 1984, his promotion dossier was also considered as his annual review submission. On February 15, 1985, the Primary Committee recommended that Colburn not be reappointed after the end of the 1985–86 school year.

Colburn then wrote Chairperson Hope with additional information that was not contained in the Primary Committee's recommendation. On March 1, 1985, Hope notified Colburn that he was not recommending Colburn's reappointment for the next academic year. Hope offered Colburn the opportunity to submit any additional information he wished. On March 14, Colburn submitted a detailed request for Hope to reconsider his decision. Hope gave Colburn's request for reconsideration to the Primary Committee for its review and comment.

The Committee replied to the points raised by Colburn and reaffirmed its recommendation of non-reappointment. Hope shared the Primary Committee's response with Colburn. On March 26, 1985, Hope notified Colburn that he had informed Dean Plater of his final recommendation against Colburn's reappointment and enclosed a copy of the University's policy statement on non-reappointment. On April 1, 1985, Plater informed Colburn that he

concurred with Hope and had forwarded the non-reappointment decision to the Dean of Faculties. On April 23, 1985, Colburn received official notice of the final decision. This letter from Vice President Irwin stated that it "constituted the University's official notice of non-reappointment...."

On April 25, 1985, Colburn requested that a Faculty Board of Review consider his denial of promotion (along with the decision not to reappoint him). The Board of Review consists of faculty from various departments, and is a faculty-created procedure for review of faculty grievances. The Board's recommendations are advisory only and are not binding on the University.

Colburn retained private counsel and also had the advice of a law school professor for the Board hearings. He was given a multi-day hearing before the Board at which he was permitted to present witnesses and documents. He presented, among other things, four large volumes of materials. Colburn felt the hearing was conducted fairly and appropriately.

The Board Hearings were held in the fall of 1985. On December 6, 1985, the Faculty Board of Review recommended that the Sociology Department undertake a "complete self-study of its tenure review process" in order to correct "difficulties in the Primary Committee." The Board further recommended that Colburn be given a two-year terminal appointment to the end of the 1987–88 academic year and that during this period he would not be reviewed for promotion or tenure. In response to this advisory recommendation, the University offered Colburn a terminal appointment as a Visiting Assistant Professor for one year.

On January 20, 1986, Colburn wrote Vice President Irwin and rejected the offer of a terminal appointment, and informed Irwin that he was proceeding to appeal the matter to President Ryan and the Board of Trustees. Colburn also stated that he had "directed [his] attorneys to initiate legal proceedings against the University at the earliest possible date." The appeal to the President and the Trustees continued, and on June 30, 1988, Executive Vice President Pinnell wrote Colburn and stated that his

decision was to affirm the decision of non-reappointment. Pinnell wrote that his "review and decision fulfill the review procedure under the University's policies and practices and you may consider it final."

### F. *Facts Relevant to Khoury:*

#### 1. Khoury's Request for Promotion:

In the fall of 1984, Khoury recommended himself for promotion. On October 16, 1984, he submitted a dossier in support of his request for promotion to Chairperson Hope. Khoury's request for promotion went through the normal channels. On October 29, 1984, Paul Bippen, director of the Columbus campus where Khoury taught, recommended Khoury for promotion.

On November 6, 1984, the Primary Committee unanimously recommended against Khoury's promotion as did Chairperson Hope on November 7, 1984. The Unit Promotion Committee then recommended Khoury for promotion, but Dean Plater recommended against promotion on December 7, 1984. Before sending his recommendation to Executive Dean Schaller, Plater provided Khoury with a draft of his recommendation and offered him the opportunity to submit any additional information relevant to the recommendation Plater was planning to make.

Khoury submitted a five-page letter with five documents attached to it outlining his disagreement with Plater's tentative recommendation. Plater considered Khoury's letter, but found no reason to change his recommendation. Plater included Khoury's letter in his dossier.

The all-campus Promotions Committee recommended in favor of promotion in February of 1985 by an 8 to 7 vote. On March 12, 1985, Dean Plater informed Khoury that Executive Dean Schaller and Vice President Irwin recommended against promotion. Plater's letter stated that the negative recommendation was being "forwarded" to President Ryan, and Plater stated that he would "keep [Khoury] informed about your candidacy at each stage of the review process." This was the last official notice that Khoury received regarding his request for promotion.

#### 2. Khoury's Denial of Tenure:

Khoury compiled and submitted a tenure dossier that was identical to his promotion dossier, and Khoury's request for tenure went through all the proper channels. Director Bippen recommended tenure, and the Primary Committee voted in favor of tenure. Chairperson Hope recommended against tenure, but on December 11, 1984, the Unit Committee voted in favor of tenure.

By letter dated January 15, 1985, Dean Plater informed Khoury that he had recommended against tenure. Dean Plater previously provided Khoury with a draft of his recommendation and permitted him to respond. Khoury responded with a nine-page letter. Plater considered the letter but did not change his recommendation.

The Promotions Committee deadlocked on the issue of Khoury's tenure, but by letter dated March 12, 1985, Khoury was informed that Executive Dean Schaller and Vice President Irwin recommended against tenure. This was the last notice Khoury received that he would not be granted tenure.

#### 3. Khoury's Non-reappointment:

By letter dated January 15, 1985, Dean Plater informed Khoury that he was recommending to the Dean of Faculties that Khoury not be reappointed after the 1986–87 academic year. Dean Plater enclosed a copy of the University's "Policies Governing Reappointment and Non–Reappointment during Probationary Period." By letter dated April 12, 1985, Khoury received formal notice that, as is customary when tenure is denied, he would be appointed for only one additional academic year. Khoury did not receive this letter, however, until at least April 25, 1985. Khoury declined the University's offer of reappointment for the 1985–86 academic year and resigned his employment on August 23, 1985.

On April 25, 1985, as discussed previously in setting forth the facts of Colburn's employment, Colburn requested that a Fac-

ulty Board of Review be convened. Colburn stated in his letter that he was making his request "in conjunction with ... Robert Khoury, who has also been denied promotion and tenure, and who is also filing a request to convene a Faculty Board of Review." No other evidence in the record has been brought to the Court's attention indicating that Khoury actually filed such a request.

G. *The Lawsuit:*

On April 21, 1987, plaintiffs filed their 23–page complaint seeking relief under 42 U.S.C. § 1983, § 1986, and State contract law. Named as defendants are the Trustees of Indiana University, as well as six faculty members of the University who are all sued in their individual and official capacities. Both plaintiffs claim violations of their due process and First Amendment rights, and also seek recovery for breach of contract. Plaintiffs seek compensatory damages, injunctive relief, and punitive damages.

With this background, the issues raised can be addressed after the relevant summary judgment standards are outlined.

## II. SUMMARY JUDGMENT STANDARDS

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Further, Rule 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, sum-

mary judgment, if appropriate, shall be entered against the adverse party.

Since the Supreme Court's trilogy of decisions on summary judgment, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), it is clear that the mandatory aspects of Rule 56 must be followed by the district courts, and, as a result, summary judgment must be entered where appropriate.

Decisions of the Seventh Circuit reflect this change in attitude as well. *See, e.g., Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989); *Spellman v. Commissioner,* 845 F.2d 148, 152 (7th Cir.1988); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473 (7th Cir.1988).

With these standards at hand, the Court will address the substantive questions raised.

## III. DISCUSSION

A. *The Trustees and the Official Capacity Defendants Are Not "Persons" Who May Be Sued Under 42 U.S.C. § 1983:*

During the pendency of this summary judgment motion, the Supreme Court decided that States and State actors sued in their official capacity are not "persons" within the meaning of § 1983. In *Will v. Michigan Dept. of State Police,* 491 U.S. ──, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), a sharply divided 5–to–4 Court held that, even apart from Eleventh Amendment considerations, a State is not a suable person in *any* court (albeit federal or state) under the statutory meaning of § 1983. *See* S. Nahmod, *Civil Rights and Civil Liberties Litigation* § 6.20 (2d ed. Supp.1989) (discussing decision); *Grosz v. State of Indiana,* 730 F.Supp. 1474, 1477–78 (S.D. Ind.1990) (Tinder, J., noting effect of *Will*).

■ Although the parties have not addressed this issue, the Court notes this matter because the "person" requirement

of § 1983 claims is an essential element of such a cause of action. The question in this case is thus whether the Trustees of Indiana University and the officials it employs are suable persons after *Will*. Resolution of this issue turns on whether Indiana University is properly considered an "alter-ego" of the State for these purposes.

Although the *Will* opinion does not contain a specific discussion of this alter-ego problem, it is implicit from the decision that the Supreme Court considers this doctrine applicable in this context. This is so because one of the named defendants that was dismissed from the case was the Michigan State Police Department. The *Will* Court implicitly ruled that this agency was an alter-ego of the State and that a suit against the State Police was a suit against the State itself. Such a ruling is in accord with decisions in the Eleventh Amendment context in which State agencies are accorded immunity from suit in federal courts. *See, e.g., Cannon v. University of Health Sciences/Chicago Med.*, 710 F.2d 351 (7th Cir.1983); *Shannon v. Bepko*, 684 F.Supp. 1465 (S.D.Ind.1988) (Barker, J.).

Such a holding is also in line with earlier pre-*Monell* decisions from the Circuits wherein it was held that suits against State agencies that did not have sufficient independence from the State were actually suits against the State itself. *See* S. Nahmod, *Civil Rights and Civil Liberties Litigation* § 6.20 (2d ed. 1986) (listing cases that, prior to *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct.2018, 56 L.Ed.2d 611 (1978), held that states and state agencies were not "persons" under § 1983). In this case, the facts show that Indiana University is a state agency, and that the Indiana General Assembly and the Governor's office retain significant control over the University's budget.[4]

Thus, as plaintiff concedes in the Eleventh Amendment context (*see* Brief at 1–2), Indiana University is apparently the alter-ego of the State for § 1983 purposes. *Cf., Avins v. Mangum*, 450 F.2d 932, 933 (2d Cir.1971) (in a pre-*Monell* case, the Second Circuit treated a state university as the alter ego of the State and held that it was not a suable person under § 1983). So too, then, are the officials of Indiana University who are sued in their official capacities. *Will*, 109 S.Ct. at 2311.

Accordingly, it appears that the plaintiff cannot recover compensatory damages from Indiana University nor from the official capacity defendants because they are not "persons" under § 1983. The *Will* decision does not, however, prevent state officials from being sued under § 1983 for "damages [and injunctive relief] in their individual capacities...." S. Nahmod, *Civil Rights and Civil Liberties Litigation* § 6.20 (2d ed. Supp.1989); *Parsons v. Bourff*, 739 F.Supp. 1266, 1267 (S.D.Ind. 1989) (individual capacity claims remain after *Will*). Nor does *Will* prevent injunctive relief claims against official capacity actors. *Will*, 109 S.Ct. at 2311 n. 10.

The Court does not definitively decide this "person" issue, however, because as is shown below, the same result is reached as a matter of jurisdiction under the Eleventh Amendment.

### B. *Eleventh Amendment:*

■ Similarly, Indiana University and its official capacity actors are immune from suit for damages in federal court by virtue of the current interpretation of the Eleventh Amendment. *See Cannon v. University of Health Sciences/Chicago Meg.*, 710 F.2d 351 (7th Cir.1983); *Klein v. Trustees of Indiana University*, 766 F.2d 275, 280

---

4. Indiana University is designated as one of the State's agencies under *Ind.Code* § 4–12–1–2. The State of Indiana retains fundamental control over the University. Indiana University is funded largely by appropriations from the Indiana General Assembly, and the University is required to make financial reports to the State budget agency. Defendant Trustees of Indiana University is a legal entity created by *Ind.Code*

§ 20–12–23–2 to administer the University. A majority of the members of the Board of Trustees are appointed by the Governor, and their terms of office and meetings are set by State law. The Trustees' power to issue bonds is subject to approval by the Governor and other state officials as well as the Indiana General Assembly.

(7th Cir.1985); *Wellman v. Trustees of Purdue University*, 581 F.Supp. 1228 (N.D.Ind.1984). The merits of any of the damages claims thus cannot be reached because jurisdiction is lacking over such claims.

Plaintiffs concede that the Eleventh Amendment bars the damages claim against these defendants, as well they must in light of authority such as *Dube v. State University of New York*, 900 F.2d 587 (2d Cir.1990) (state university could not be sued in federal court because it was an "integral part of the government of the State"). *See also Port Authority Trans–Hudson Corp. v. Feeney*, —— U.S. ——, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (Brennan, J., concurring) (discussing standards for "arm of the state" jurisprudence, and writing that the "Eleventh Amendment shields an entity from suit in federal court only when it is so closely tied to the State as to be the direct means by which the State acts, for instance a state agency."). Indeed, Judge Barker of this Court has squarely held that Indiana University and IUPUI are unreachable state agencies for purposes of the Eleventh Amendment. *See Shannon v. Bepko*, 684 F.Supp. 1465 (S.D. Ind.1988).

Instead, plaintiffs seek to recover against the University and the official capacity actors only for injunctive relief. Defendants admit that jurisdiction exists over such injunctive relief claims. *Accord, Shannon*, 684 F.Supp. at 1476. Thus, the damages claims against the Trustees of Indiana University and the official capacity defendants must be dismissed; the injunctive relief claims survive at this juncture.

### C. *First Amendment Claims:*

The plaintiffs allege that their respective denials of promotion, tenure, and reappointment were in retaliation for their requests of an external review of the Primary Committee and disagreements they raised about the structure of the Committee and the way it operated. They thus claim that they were denied the right of free speech guaranteed by the First and Fourteenth Amendments.

■ Although public employees do not lose their First Amendment rights by virtue of their employment, such rights are not absolute. In the First Amendment context, the Supreme Court has recognized "two limitations—one of content and one of context—on the right of public employees to express themselves free from the threat of retaliation by their employers." *Biggs v. Village of Dupo*, 892 F.2d 1298, 1301 (7th Cir.1990).

" 'When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.' " *Id.* (*quoting Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)). "And, public employers may lawfully regulate employees' expression, even on matters of public concern, if the 'interests of the State, as an employer, in promoting efficiency of the public service it performs through its employees' outweigh the 'interests of the [speaker], as a citizen, in commenting on matters of public concern.' " *Biggs*, 892 F.2d at 1301 (*quoting Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)).

■ There is thus a two-pronged inquiry in these cases. The first analysis focuses on whether the expression is fairly considered to raise matters of public concern. If so, then the second inquiry asks whether the interests of the State in promoting the efficiency of its public services outweigh the interests of the citizen-speaker in commenting on matters of public concern. Both inquiries must be determined by the " 'content, form, and context of a given statement, as revealed by the whole record.' " *Biggs*, 892 F.2d at 1302 (*quoting Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690). Moreover, each issue is a question of "law to be decided by the court, not the jury," even though factual determinations may be involved. *Biggs*, 892 F.2d at 1300 (*quoting Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7); *Patkus v. Sangamon–*

*Cass Consortium,* 769 F.2d 1251, 1257 (7th Cir.1985).

In this case, then, the initial question is whether the plaintiffs' internal complaints and requests concerning the Primary Committee can be considered matters of "public concern." Resolution of this issue is not as easy as each party would suggest, *see Belk v. Town of Minocqua,* 858 F.2d 1258, 1263 n. 7 (7th Cir.1988) (noting that "matters of public concern are rarely ... easily discerned"), for an evaluation of the "content, form, and context" of the speech in question reveals that the speech can arguably be viewed as promoting purely private personnel interests. The record shows that plaintiffs wanted the Primary Committee to be reviewed for their own professional benefit. However, the speech can also be seen as having some potential impact on the viability of the University's Sociology Department, something that could be a matter of public concern, because other Sociology faculty members requested a review of the Primary Committee as well. One can legitimately argue, as plaintiffs do, that the Primary Committee needed to be reformed so that Sociology professors would be evaluated and promoted on the basis of their abilities rather than their intra-departmental politics.

The case law illustrates the subtle differences in the context, content, and form of different types of speech in this area. For instance, in *Knapp v. Whitaker,* 757 F.2d 827 (7th Cir.1985), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985), the Seventh Circuit held that some complaints made by a teacher to a school board raised matters of public concern, while others were private in nature and not entitled to First Amendment protection. In *Knapp,* the record showed that the plaintiff, who was a school teacher and coach, had contacted school board members regarding:

[1] his classroom assignment; [2] the content of [his] evaluations; [3] the inequitable mileage allowance for ... coaches; [4] the liability insurance provided ... for coaches and volunteer parents who transport student-athletes to school-related activities; [5] and the general ineffectiveness of the grievance procedure within [the school district.]

757 F.2d at 840.

The Seventh Circuit held that items one and two above were not matters of public concern as his evaluations and assignments were "clearly personal matters relating solely to [his] employment...." *Knapp,* 757 F.2d at 840. His speech on these issues "was not an attempt to inform the public that the administrators ... were failing to discharge their governmental responsibilities." *Id.* Because the "'First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs,'" *Id.* (*quoting Connick,* 461 U.S. at 149, 103 S.Ct. at 1691), the Seventh Circuit held that these personal matters were not protected. Thus, the content and context of this particular speech led to its unprotected status.

The inequitable mileage allowances and liability insurance issues, however, were held to be protected matters of public concern. The *Knapp* court reasoned that the mileage allowances involved "not only Knapp but all of the coaches at Woodruff who travel to area high schools to scout opposing teams and who transport student-athletes to school-related events in their own vehicles." *Knapp,* 757 F.2d at 840. The thrust of the Court's holding on the mileage allowance issue was that Knapp's speech "focused upon the inequitable allocation of public funds to a select group of ... high school coaches." *Id.* "Knapp's speech to the School Board on the issue of mileage allowance was an attempt to inform the public and the educational policymakers ... that officials ... were failing in their duty to properly administer the allocation of public funds." *Id.* Thus, the form of the speech (open complaints to the "public" school board) and its content and context (dealing with inequitable distribution of public funds) weighed in favor of protection.

As to the liability insurance issue, the Seventh Circuit reasoned that this was a matter of public concern because "the citizens of Peoria, as taxpayers, have a finan-

cial interest in the terms of the School District's insurance policy and the amount of coverage provided when the School District is held liable for an accident involving a school employee or authorized volunteer personnel." *Id.* at 841. The *Knapp* court added that the "failure to provide the citizens ... with such insurance information borders upon a breach of the School District's duty to inform the community of the public school system's policies concerning potential liabilities." *Id.* Again, the content, form, and context all indicated that this was a matter of public concern.

As to the final area of speech concerning the teachers' grievance procedure, the Seventh Circuit first noted that the "functioning of a grievance procedure is generally an [unprotected] internal issue, important only to the teachers and School District employees who must use the procedure to air their complaints about employment conditions and practices." *Id.* In the *Knapp* scenario, however, "the grievance procedure was the subject of ongoing collective bargaining negotiations between the teachers' union and the administrat[ion]...." *Id.* The speech was thus protected because of its unique context, as well as the fact that it was being aired in an open forum to the school board.

The *Knapp* decision thus provides a good slide-rule against which today's case can be measured because it involves various types of speech made in the academic environment. A brief review of the record here as it relates to the plaintiffs' speech is necessary. The plaintiffs in this case allege that they were adversely treated because of their complaints about the Primary Committee. These complaints were made by both plaintiffs, as well as a few other Sociology professors, to Executive Dean Schaller and later to the Department Chairperson. The plaintiffs requested that the Primary Committee be reviewed by the University's Tenure Committee.

These complaints were made in the context of an intra-departmental political feud involving two opposing "factions" of professors. The context of the rivalry was that two groups were seeking control of the Primary Committee because of its influence in promotion and tenure decisions. As both plaintiffs admitted in their depositions, they were concerned that their own personal situations would be adversely affected by the Committee. As to the content of the complaints, plaintiffs were seeking to have the Committee reviewed by an external body.

In comparing the form, content, and context of this speech to that involved in *Knapp,* the Court finds today's setting to most closely resemble the complaints made by Knapp regarding the grievance procedure. The complaints about the grievance procedure were held to be protected in *Knapp,* but *only* because the issue had become one of public concern in the ongoing collective bargaining negotiations affecting the entire school system. There are important differences between today's case and the grievance procedure complaints made in *Knapp.*

First, unlike in *Knapp* where the complaints were aired in an open forum to the school board, the speech in this case was made internally to the Department Chairperson and the Executive Dean. Plaintiffs have pointed to nothing in the record indicating that the public was either aware of or interested in these events. This distinction in form is significant in this case, for it is suggestive of the plaintiffs' reasons for speaking.

Second, and most importantly, plaintiffs' fundamental concern was obviously, and understandably, their own personal career advancement. As Colburn stated in his March 19, 1984, letter to Dean Schaller, "I feel that my personal and professional development is in jeopardy as a result of this unresolved turmoil...." Turmoil concerning the function of the Primary Committee, much like a grievance procedure, is "generally an internal issue." *Knapp,* 757 F.2d at 841. *Cf., Ekanem v. Health & Hospital Corp.,* 724 F.2d 563 (7th Cir., 1983) (affirming Judge Steckler's ruling that a memorandum to a department supervisor regarding department organization was an internal matter).

This is so because, although the public is indirectly affected because these internal mechanisms ultimately affect the quality of education, the primary and direct effect of these procedures is on the employees themselves. As the Sociology Department's own By–Laws state, "The Primary Committee *serves to evaluate faculty* for reappointment, tenure, and promotion." Much like a grievance procedure for teachers, the Primary Committee is an internal personnel device geared primarily towards the private interests of the teachers it affects. This factor weighs in favor of a finding that the speech in question is not protected.

As the Seventh Circuit recently stated, "[T]he *Connick* test requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern ...? Or was the point to further some purely private interest." *Hesse v. Board of Education of Township High School*, 848 F.2d 748, 752 (7th Cir.1988) (emphasis in original) (quotations omitted). *See also Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir.1987) (also focusing on what the point or purpose of the speech was). "The *Connick* test does not look to what may be conveyed by the employee's speech, but rather, requires a court to look to the reasons the employee is speaking." *Auriemma v. Rice*, 895 F.2d 338, 347 (7th Cir.1990). *Compare Belk v. Town of Minocqua*, 858 F.2d 1258, 1264 (7th Cir.1988) (suggesting that content of speech rather than purpose is the most important factor).

Here, given the content and context of the speech, it becomes evident that the point of the complaints was to protect the plaintiffs' own personal interests. *Cf., Mahaffey v. Kansas Board of Regents*, 562 F.Supp. 887 (D.Kan.1983) (tenured professor's proposal that his department be accredited separately from another was not a matter of public concern).

In conclusion, in evaluating the form, content, and context presented, the speech in question involved a private personnel matter rather than something of public concern. Becuase the "First Amendment

does not protect public employees' ordinary personnel disputes," *Biggs*, 892 F.2d at 1302, the speech in question was not safeguarded. This is not a case where professors were adversely treated for expressing opinions on controversial world topics in the classroom. *See, e.g., Dube v. State University of New York*, 900 F.2d 587 (2d Cir.1990). *See also Coats v. Pierre*, 890 F.2d 728, 732 (5th Cir.1989) (professor's complaints that student athletes were shown favoritism and that certain faculty members traded grades for sex touched upon matters of public concern). Rather, the weight of the evidence shows that plaintiffs were primarily interested in their own private affairs; indeed, events subsequent to their complaints show that their fears and complaints might well have been completely justified.

That, however, does not mean that they were protected under the First Amendment. "The Constitution simply does not guarantee public employment unsullied by the potential for silly and at times unjustified termination or transfers...." *Callaway*, 832 F.2d at 416. Here, although the defendants' actions might well be appropriately so categorized, the defendants prevail on this aspect of this constitutional litigation. Summary judgment is granted accordingly on the First Amendment claims.[5]

### D. *Due Process Claims:*

The plaintiffs also contend that the defendants' actions denied them procedural due process of law under the Fourteenth Amendment. In essence, plaintiffs claim that they had property interests in their continued employment and promotion, and that they were deprived of those interests without the required procedural safeguards. This claim thus raises two separate issues: whether they had such property interests, and, if so, whether they received due process.

Here it is appropriate to first note the possible sources of property interests upon which the plaintiffs do *not* rely. Unlike some states, Indiana's legislature has not

---

5. As a result, the Court need not and does not reach the second prong of the *Connick* analysis.

spoken to the subject of tenure in the State's universities. Rather, the Indiana General Assembly has chosen to simply give each university's Board of Trustees the authority and responsibility to "employ ... faculty...." *Ind.Code* § 20–12–1–4. Nor are there duly promulgated administrative regulations on this issue. Accordingly, there are no statutory or regulatory bases present.

Instead, the plaintiffs claim the existence of a property right based upon their appointments, the Faculty Handbooks, the Department By–Laws, and the custom and policy of the University to, as Khoury states in his deposition, extend the appointment "at least until the end of [the six-year] probationary period and through [the] review for tenure" if his "performance w[ere] rated satisfactory...." Thus, rather than interpreting State statutes as this Court is often called upon to do in the property interest setting, *see, e.g., Marvin v. King,* 734 F.Supp. 346 (S.D.Ind.1990), the Court must grapple with State contract law and the somewhat nebulous realm of "mutually explicit understandings." Once the legal status of plaintiffs' employment relationship is determined, the property interest analysis can proceed.

1. *The nature of plaintiffs' employment under Indiana law:*

The parties disagree as to whether plaintiffs had any contract with the University, and, if so, what the duration and terms of such a contract were. Defendants go so far as to argue that plaintiffs were at-will employees, while plaintiffs even assert that they had seven-year contracts. The Court must look to Indiana contract law and the agreements reached by the parties to determine whether the answer lies at one of these extremes or somewhere in between. The resolution of this initial issue is crucial and requires substantial analysis because, as will be seen, it dictates much of the outcome of this case.

▪ In Indiana there are two basic types of employment relationships: (1) employment at will, *see, e.g., Mead Johnson and Co. v. Oppenheimer,* 458 N.E.2d 668

(Ind.App.1984), and, (2) employment for a definite term. *See, e.g., Peterson v. Culver Educational Foundation,* 402 N.E.2d 448 (Ind.App.1980). There is a "presumption [in Indiana] that employment is at will...." *Speckman v. City of Indianapolis,* 540 N.E.2d 1189, 1192 (Ind.1989). However, as with most presumptions, this one is rebuttable.

▪ The at will presumption can be rebutted by a showing that there is an "agreement between the employer and the employee." *Id.* This agreement, however, must provide for a definite term of employment in order to alter the at will status. *Hamblen v. Danners, Inc.,* 478 N.E.2d 926, 928 (Ind.App.1985) (employment relationship "is terminable at will unless there is a promise of employment for a fixed duration"). As the Indiana Court of Appeals has stated on several occasions:

'In Indiana the general rule governing both oral and written employment contracts is well settled. If the tenure of service cannot be determined from the terms of the contract, such contract is one at will, and may be terminated at any time at the election of any party. * * * [However,] [a] term employment contract is enforceable....'

*Mead Johnson And Co. v. Oppenheimer,* 458 N.E.2d 668, 670 (Ind.App.1984) (*quoting Pepsi–Cola General Bottlers, Inc. v. Woods,* 440 N.E.2d 696, 697 (Ind.App.1982).

Thus, the key is whether there is a contract for a definite term. "Where ... there is an employment contract for a definite term in which the employer has not reserved the right to terminate the employment before the conclusion of the [term] of the contract, the employment 'may not be terminated except for cause or by mutual agreement.'" *Seco Chemicals, Inc. v. Stewart,* 349 N.E.2d 733, 738 (Ind.App. 1976) (*quoting Rochester Capital Leasing Corp. v. McCracken,* 295 N.E.2d 375, 378 (Ind.App.1973).

▪ In this case, although the parties' arguments on this issue do not immediately point to this conclusion, it is apparent that the plaintiffs had employment contracts

with the University for a definite term of one academic year. When plaintiffs were appointed, the University's agents and the plaintiffs signed written documents for their "initial appointment" to the faculty of the University. Each document specifically indicated a beginning date of the appointment corresponding to the start of the academic year, an ending date corresponding to the end of the academic year, and a stated salary for the entire term. Thus, nothing was indefinite about the term of the contract, for the written documents expressly provided for a duration of one academic year.[6]

This holding is supported by other cases in this area. For instance, in *Peterson v. Culver Educational Foundation*, 402 N.E.2d 448 (Ind.App.1980), the parties stipulated at trial that the teacher had a contract for a definite term for one academic year. Before addressing other issues stemming from this employment agreement, the Indiana Court of Appeals first implicitly approved of the parties stipulation by noting that the school teacher had "a contract of employment for a definite term...." *Id.* at 451. During that term, the teacher could only be discharged for cause. *Id.* See also *Seco Chemicals, Inc. v. Stewart*, 349 N.E.2d 733, 738 (Ind.App. 1976) (salesman's contract for a term of two years was a definite term contract); *Board of Regents v. Roth*, 408 U.S. 564, 566, 92 S.Ct. 2701, 2703, 33 L.Ed.2d 548 (1972) (noting that professor had been hired "for a fixed term of one academic year"); *Eichman v. Indiana State Univ. Bd. of Trustees*, 597 F.2d 1104, 1109 (7th Cir.1979) (probationary tenure-track professor at Indiana State University had a "series of one year contracts"); *Lovelace v. Southeastern Massachusetts University*, 793 F.2d 419 (1st Cir.1986) (in similar scenario to today's case, First Circuit implies that a "tenure-track" professor appointed for one academic year had a one year definite term contract).

Moreover, today's case is distinguishable from *Hamblen v. Danners, Inc.*, 478 N.E.2d 926 (Ind.App.1985), upon which defendants try to rely. Defendants cite *Hamblen* for the proposition that "although a contract may be effective from one date to another, if it does not *promise* employment for one year, it is not a contract for definite duration." (Reply Brief at 7) (emphasis in original). Defendants further state that the *Hamblen* court affirmed summary judgment for the employer on the grounds that "although the plaintiff's executive employment agreement was effective from one day to another it did not promise employment for one year." (Reply Brief at 7).

A close reading of *Hamblen* shows that while defendants' general statements are not inaccurate, they do not tell the whole story. The complete facts of *Hamblen* are that the employee was hired to load trucks, and was later promoted into a supervisory position. "He signed an Executive Employment Agreement[,] [but] did not take the agreement seriously." *Hamblen*, 478 N.E.2d at 927. "It was Hamblen's understanding that [the employer] simply wanted a contract on file." *Id.* "Moreover, it was not unusual for six months to elapse before an unexpired contract would be renewed." *Id.* Additionally, the "contract" stated that it was to expire at a certain date in the future, and it allowed the employer to ter-

---

**6.** Contrary to defendants' assertions that the plaintiffs viewed their employment as indefinite (Brief at 27), this is not inconsistent with the plaintiffs' understandings of their employment status. For instance, although defense counsel, through the use of a leading question, obtained Colburn's agreement that it would "be fair to say ... that ... your employment would be indefinite ...," (Depo. at 14), Colburn also testified that he felt the University had a "commitment" to employ him if he met professional standards of achievement. The context of Colburn's "admission" shows that the admission is not dispositive, for it is plausible, if not likely,

that Colburn was speaking in terms of his long-term "indefinite" status.

Similarly, although defense counsel, through another leading question, obtained Khoury's admission that his employment was indefinite (Depo. at 71), Khoury's testimony also indicates that he believed he had a year-to-year contract. Indeed, defense counsel even seemed to admit that the employment was year-to-year. (Depo. at 70). Moreover, the plaintiffs' own understandings are of little or no value on the issue of what their employment agreement was when there are documents attesting to these matters.

minate him if the employer were of the opinion that he had not "faithfully and diligently" performed his duties. *Id.*

In affirming the trial court's holding that Hamblen was an employee at will, the Indiana Court of Appeals relied heavily on the fact that "the contract specified that [the employer] could terminate employment at any time during that period *based on its sole judgment and opinion of Hamblen's performance.*" *Hamblen*, 478 N.E.2d at 928 (emphasis added). "Furthermore," the Court of Appeals wrote, "neither Hamblen nor [the employer] intended the contract to provide additional job security." *Id.* And, "Hamblen admitted that his rights as an employee were the same whether he was working under the Executive Employment Agreement or under an expired contract." *Id.* Thus, it is seen that *Hamblen* is so factually distinguishable that it is of no weight in today's case.

Additionally, defendants argue that the contract is really not one for a definite term because the Faculty Handbook states that the appointment dates are "followed for determination of the precise span of time during which the mutual obligations of an employer-employee relationship exist for the purpose of proration of pay, when such proration is necessary, and for fringe benefit entitlements." Relying on this portion of the Handbook, defendants assert that "specifying the dates of appointment [in the appointing documents] has nothing to do with the promise of continued employment but only pay and fringe benefits." (Reply Brief at 7).

■ This is an interesting and creative argument that has appeal on the surface, but it is a proposition that the Court is not persuaded to accept. Defendants are forced to rely on the Faculty Handbook to make this assertion. Yet, in the same breath, they remind the Court that "absent a promise of employment for a definite duration, policy manuals and handbooks are meaningless." (Reply Brief at 8). Although this is a correct statement of Indiana law, *see, e.g., Tri-City Comprehensive Community v. Franklin*, 498 N.E.2d 1303, 1306 (Ind.App.1986), it shows the logical fallacy and circular nature of their argument that the appointment dates do not make this a definite term contract.

If the appointment dates do not make this a definite term contract, then, as defendants correctly assert, the employee handbooks are irrelevant; yet defendants attempt to rely on the handbooks to make this point, so they must be admitting that the contract is one for a definite term. Indeed, on their face, the appointment documents with the specific appointment and termination dates *do* make this a definite term contract. There is no ambiguity, and the Court has made this determination as a matter of law. *Kokomo Veterans Inc. v. Schick*, 439 N.E.2d 639, 643 (Ind.App.1982) (if no ambiguity in terms, construction is for court).

The appointment documents also specifically state that the "conditions and terms of the initial appointment, as well as the criteria and procedures for reappointment and tenure, are agreed to." These "conditions and terms" obviously come from the Faculty Handbook, and are thus made a part of the employee's contract. *Accord, Speckman v. City of Indianapolis*, 540 N.E.2d 1189, 1192 (Ind.1989) (where parties had expressly agreed to be bound by the personnel manual, that manual was binding); *compare Shannon v. Bepko*, 684 F.Supp. 1465, 1478 (S.D.Ind.1988) (handbook was not a part of the contract where parties stipulated that employee was hired "for an indefinite term").

However, to interpret the "Appointment Dates" policy in the manner suggested by defendants would destroy the validity of the contract as one for a definite term as construed from the face of the contract, but without expressly stating that this would be the effect. Defendants' version of the contract would be as follows:

"We have a contract for a definite term from September to May of the following year, and the Handbook is binding. However, as the Handbook states, this is really not a contract for a definite term. Thus, the Handbook is not binding."

Such a construction is unreasonable and circular, and courts are to avoid such interpretations. *See Rieth–Riley Construction Co. v. Auto–Owners Mutual Ins. Co.,* 408 N.E.2d 640, 645 (Ind.App.1980) (in interpreting contract, court must adopt construction that appears to be in accord with justice, common sense, and the probable intention of the parties). If there is not a definite term contract by virtue of the Handbook, then the Handbook does not apply; without the Handbook, there is no possibility of construing this as anything but a definite term contract.

A more reasonable and harmonious construction of the Handbook's "Appointment Dates" proviso is that it is meant to explain why the particular beginning appointment dates (seven days prior to the school year) and termination dates (day of graduation exercises) of each appointment were selected by the Board of Trustees. The proviso itself still speaks of the "mutual obligations of an employer-employee relationship," and thus does not lead to the conclusion advanced by the defense.

Finally, today's case is not unlike the scenario presented to this Court last year in *Spearman v. Delco Remy Div. of GMC,* 717 F.Supp. 1351 (S.D.Ind.1989). In *Spearman,* the employee had a written contract for "month to month" employment with Delco Remy which specified his rate of pay. At the end of March of 1985, the employee was discharged, and the employee later sued. In addressing the parties' motions for summary judgment, this Court held that the employee had a one month definite term contract that was renewable each month at the will of the parties. *Id.* at 1356.

The Court determined that during the month of employment, the employee could only be discharged for cause or upon agreement of the parties. As to the next month, however, the employee did not need to be rehired unless the employer chose to do so. Thus, the Court concluded that the employee's only available damages were for the days not worked during March of 1985. *Id.* at 1360–62.[7]

The *Spearman* decision and the authority discussed at length above lead the Court to conclude that Professors Colburn and Khoury had one year definite term contracts with the University.

■ The next level of inquiry must focus on the conditions of the parties' contracts and whether they created property interests. The terms and conditions of their contracts, by express written agreement, included the "criteria and procedures employed in recommendations and decisions about reappointment and the awarding at Indiana University and any special procedures customarily employed in the department, school, program, or division of the University in which may appointment is to be recommended." Thus, the Faculty Handbooks and Department By–Laws, as well as any procedures "customarily employed," became a part of the contract.

Accordingly, during each academic year that they had been appointed, plaintiffs could only be dismissed for cause, as the Faculty Handbooks make clear. This right, of course, was already accorded to the plaintiffs under Indiana law by virtue of their definite term contracts. *See, e.g., Peterson v. Culver Educational Foundation,* 402 N.E.2d 448, 451 (Ind.App.1980); *Seco Chemicals, Inc. v. Stewart,* 349 N.E.2d 733, 738 (Ind.App.1976).

This protection, however, is of little use to the plaintiffs in today's litigation, for it is undisputed that plaintiffs were *not dismissed* during any term for which they had been appointed. As the Faculty Handbook

7. The Court notes that the summary judgment order in *Spearman* was originally appealed by the employee, but the employee later voluntarily dismissed his appeal. Since the *Spearman* opinion was issued, it has not been cited in any published opinions. In the upcoming edition of the *Indiana Law Review* surveying 1989 developments in Indiana law, the authors of the Labor Law article feature the *Spearman* decision. However, the authors deal only with the administrative collateral estoppel issue of *Spearman* and do not criticize or otherwise mention the "definite term" aspect of the decision. *See* L. Cross and D. Haney, *Survey of Developments in Indiana Labor Law,* 23 Ind.L.Rev. 2 (to be published in early summer 1990) (draft available from Indiana Law Review office).

emphasizes, dismissal "shall mean the involuntary termination ... of the appointment of a non-tenured faculty member ... prior to the expiration of the term of appointment. *"Dismissal* is thus to be distinguished from *non-reappointment* of a probationary faculty member." (emphasis in original). Here, plaintiffs completed each term to which they were appointed, so they have no basis of relief (and make no such claims) on these grounds.

The question, then, is whether plaintiffs had a property right in being reappointed, getting a promotion, or obtaining tenure. Before resolving this issue, it is necessary to set forth the general standards for property interests so that the facts of today's case can be analyzed against the appropriate legal framework.

### 2. *Property Interest Standards:*

"Ever since *Board of Regents v. Roth,* [408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)], the basic criteria for the recognition of a property interest have been well established[.]" *Thornton v. Barnes,* 890 F.2d 1380, 1386 (7th Cir.1989). "Property interests are not created by the Constitution but are 'defined by existing rules or understandings that stem from an independent source such as state law' and arise only where the plaintiff demonstrates a 'legitimate claim of entitlement.'" *Polenz v. Parrott,* 883 F.2d 551, 555 (7th Cir.1989) (*quoting Roth,* 408 U.S. at 577, 92 S.Ct. at 2709). "Therefore, property interests in employment may be created by express or implied contracts, municipal ordinances[,] or state laws—including those 'rules or understandings that secure benefits and that support claims of entitlement to those benefits.'" *Thornton,* 890 F.2d at 1386 (*quoting Farmer v. Lane,* 864 F.2d 473, 478 (7th Cir.1988).

As the Seventh Circuit recently explained,

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a

purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Wolf v. Larson,* 897 F.2d 1409, 1411 (7th Cir.1990).

 The state law, ordinance, or mutually explicit understanding relied upon, however, must provide more than procedure, for there "is neither a 'liberty' nor a 'property interest' in procedures themselves...." *Fleury v. Clayton,* 847 F.2d 1229, 1231 (7th Cir.1988). As the Seventh Circuit has written, "In order to give rise to a constitutionally-protected property interest, a statute or ordinance must go beyond mere procedural guarantees to provide some substantive criteria limiting the state's discretion—as can be found, for example, in a requirement that employees be fired only 'for cause.'" *Cain v. Larson,* 879 F.2d 1424, 1426 (7th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 540, 107 L.Ed.2d 537 (1989). "If ... [the state] merely delimits what procedures must be followed before an [adverse action is taken], then it does not contain the requisite substantive procedure." *Id.*

 In this case, then, the plaintiffs' property interest cannot be based on the various procedural protections that are contained within the Handbooks and By–Laws, such as the required annual reviews or the procedural rights guaranteed upon non-reappointment. This is shown by cases such as *Farmer v. Lane,* 864 F.2d at 473, where the Seventh Circuit held that when the employer was merely required to hold mandatory reviews of employee performance, no property interest existed. Rather, any property interest must come from a statute, rule, or mutually explicit understanding that provides some substantive criteria limiting the state actors' discretion.

 It should be noted that while the "for cause" standard is commonly used by state and local governments and can give

rise to a property interest, there is nothing magical about the "for cause" language. Rather, this standard is just one type of substantive limit that can be placed upon the decision-maker's exercise of discretion. All that is required is that the employee have some legitimate claim of entitlement and that there be a "substantive requirement *resembling* the 'for cause' standard" before that interest can be infringed. *Farmer*, 864 F.2d at 480 (emphasis added).[8]

As will be seen, there are a number of cases dealing with disgruntled professors, and in most of those lawsuits the professors have had little or no success on the property interest question. Generalizations from these cases are instructive, but not dispositive. If Indiana University has imposed a substantive limit on the decision for reappointment, promotion, or tenure for these tenure-tracked professors creating a legitimate claim of entitlement, then a property interest can be found.[9]

A final issue that needs to be addressed before proceeding further is whether the existence of a property interest in a given case is a question of law for the court or a question of fact for the trier of fact. The parties have not proffered any authority either way on this issue, and the Court's own research, while resulting in several statements that this is a question of law, has not located a sufficient discussion of this issue.

For instance, in *Tarabashi v. McAlester Regional Hospital*, 827 F.2d 648, 652 (10th Cir.1987), the Tenth Circuit wrote, without explanation, that "[w]hether the facts establish a property interest is a question of law." Other cases make similar statements, but just like the *Tarabashi* decision, do not offer any analysis. *See, e.g., Easley v. University of Michigan Bd. of Regents*, 853 F.2d 1351, 1355 n. 3 (6th Cir.1988) (relying on *Tarabashi*); *Ruppert v. Lehigh County*, 496 F.Supp. 954, 956 (E.D.Pa. 1980). *Cf., Shannon v. Bepko*, 684 F.Supp. 1465, 1478 (S.D.Ind.1988) (Judge Barker holds that summary judgment was improper as to whether a property interest had been created by a mutually explicit understandings where the parties had "incompletely addressed" the issue); *Gerhardt v. City of Evansville*, 408 N.E.2d 1308, 1311 (Ind.App.1980) (stating that existence of property interest is "at least in part" a question of fact, and remanding to trial court where case had been dismissed without any evidence on issue). Additionally,

---

8. Thus, even language from the Supreme Court that the "hallmark of property ... is an individual entitlement grounded in state law, which cannot be removed except 'for cause,' " *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982), is *dicta* that cannot alone carry the day.

9. Although the plaintiffs in this case can be viewed as probationary employees, and although many courts have made general statements indicating that there are "no due process rights to probationary employees," *Fong v. Purdue University*, 692 F.Supp. 930, 947 (N.D.Ind. 1988) (*dicta*), and while other courts have squarely held that, in a given case, probationers lacked property interests, *see, e.g., Evans v. City of Dallas*, 861 F.2d 846, 849–50 (5th Cir.1988), it must be remembered that in these settings, property interests depend on the relevant facts and state law of each case. Thus, such statements and holdings are, by definition, limited to the applicable employment schemes implemented by the defendants in each case.

As the Ninth Circuit emphasized in a recent opinion, "Under [local] law, a probationary civil service employee *ordinarily* has no property interest in continued public employment and may be dismissed without good cause," *McGraw v. City of Huntington Beach*, 882 F.2d 384, 389 (9th Cir.1989) (emphasis in original). Thus, just because the states typically do not limit the reasons for which a probationary employee may be dismissed, this does *not* mean that they lack the power to do so.

Indeed, there are many cases recognizing that probationary employees may have a property interest in their continued probationary employment. *See, e.g., Lewis v. Hayes*, 152 Ill.App.3d 1020, 106 Ill.Dec. 102, 505 N.E.2d 408 (1987) (probationer has property interest where city rules state that he can be terminated "if he is found incompetent or disqualified"); *Perri v. Aytch*, 724 F.2d 362 (3d Cir.1983) (probationer who could only be discharged for cause had property interest); *Marvin v. King*, 734 F.Supp. 346 (S.D.Ind.1990) (probationary firefighter had property interest in his probationary position where he could only be discharged if his conduct or capacity were "not satisfactory."). Indeed, in this case the plaintiffs were granted a property right in continued employment during each academic year that they were appointed because Indiana law, as well as the Faculty Handbooks, prohibited their dismissal except for cause.

the Court notes that it has not located any decisions using a clearly erroneous standard of review on appeal, which could be indicative of whether this were a question of fact or law.

Because such an interest depends on State law, it would seem that whether a property interest is a question of law or fact should depend on the purported basis of that interest and whether, under State law, that basis is properly resolved by the Court or the trier of fact. Thus, if the plaintiffs were relying on a State statute or regulation for their property interest, it is clear that the interpretation of that statute or regulation would be a legal matter for the Court; as a result, the property interest question would also be a legal matter.

However, where, as here, the plaintiffs base their property interest on a contract under state law, the matter is not as clear, for in Indiana (as in most jurisdictions, *see* A. Corbin, *Corbin on Contracts* § 554 (1982)), some aspects of contract law are for the court while others may be for the trier of fact.

The *Indiana Law Encyclopedia* provides a concise summary of Indiana law on this subject, and one that has been approved of by the Indiana courts on several occasions, *see, e.g., Wilson v. Kauffman,* 296 N.E.2d 432, 437 (Ind.App.1973) (noting that this area is "well summarized" by the treatise). This treatise provides in relevant part as follows:

> As a general rule the interpretation, construction or legal effect of a contract is a matter to be determined by the court as a question of law. This rule has been frequently announced as applicable when the contract involved is written, and, likewise, the rule has been applied where the contract is clear and unambiguous.

> . . . . .

> On the other hand, the broad general rule is frequently laid down that the construction of a contract is for the jury where the terms of the contract are ambiguous and their meaning is to be determined from extrinsic evidence. Further, it has been held that where extraneous facts and circumstances are resorted to explain an ambiguous or uncertain contract, the question of construction is one of mixed law and fact. Strictly speaking, however, the interpretation of a contract is not submitted to the jury; insofar as the question is one of construction, it is always a question of law, although the facts on which the construction rests must be determined by the jury. Thus, it has been indicated that the construction of an ambiguous contract is a question of law for the court where the ambiguity arises by reason of the language used and not because of extrinsic facts. Likewise, where the contract is in question, it is the duty of the jury to find the facts, and for the court to say whether the contract is executed or executory.

6 *Indiana Law Encyclopedia* § 137 (1980).

 With this background, it is seen that in cases such as today's, there are both questions of law and fact. As to the mere existence of a contract, this is a question of law in today's case because the facts are undisputed as to the documentation of the parties agreement on appointment. Unless any of the terms of that contract are ambiguous (which they are not), the construction of the contract is for the Court. However, as to the plaintiffs' claims that there was a "mutually explicit understanding" based on custom, policy, and oral assurances, the facts are in dispute, and as will be seen, it is thus for the trier of fact to determine whether plaintiff has proven such allegations. If so, then the Court will construe their meaning.

Thus, without any better authority to rely upon, the Court will use this methodology to determine what is a question of law and what is one of fact. Because the property interest depends on State law, and in light of Indiana's treatment of these issues, the Court determines that it is constrained to accept Indiana's rules for addressing these matters.

With this background, the plaintiffs' reappointment, promotion, and tenure claims will be addressed. Although there is great similarity among these claims, the

Court will discuss each separately for the sake of clarity.

### 3. *Analysis of specific property interest claims:*

#### a. reappointment

 Both Colburn and Khoury assert that they had a property interest in being reappointed each year. Such claims have historically met with little success, and plaintiffs' claims here are not without similar difficulties.

Although the Faculty Handbooks contain "criteria" for promotion and tenure decisions, there are no criteria or standards in the Handbooks governing reappointment. True, there are "Policies Governing Reappointment and Non–Reappointment During Probationary Period," but these policies merely spell out certain procedural requirements that must be followed by the University, and the guarantee of procedure alone does not confer a property right. *Cain v. Larson*, 879 F.2d at 1426. Thus, even the express clause of the contracts incorporating any "special *procedures* customarily employed" by the department or school is of no avail given the rule that procedure does not support property rights. (emphasis added).

Moreover, the Faculty Handbooks specifically state that *dismissal,* which means the involuntary termination of non-tenured faculty members during the term of their appointments and which can only be done for incompetence, serious misconduct, or extraordinary financial emergency at the University, is "to be distinguished from the *non-reappointment* of a probationary faculty member." (emphasis in original). Thus, the Handbook itself, which is a part of the plaintiffs' contracts, strongly suggests that non-reappointment may occur for any reason.

It is true that the Sociology Department has "criteria" for the reappointment, promotion, and tenure decisions. However, these criteria never state that reappointment will occur if certain objective standards are met. For instance, there is no positive mandate that "all probationary faculty who receive satisfactory ratings shall be reappointed." Nor is there any negative command stating that "non-reappointment shall only occur if a faculty member receives an unsatisfactory rating."

In short, the "criteria" appear to be mere guidelines rather than directives. As such, they do not substantively limit the decision-makers' discretion, and no property interest is created under the contract and the incorporated Handbooks and By–Laws. Relevant case law supports this conclusion, *see, e.g., Eichman v. Indiana State Univ. Bd. of Trustees*, 597 F.2d 1104, 1109 (7th Cir.1979) (probationary tenure track professor had no property interest in reappointment); *Lovelace v. Southeastern Massachusetts Univ.*, 793 F.2d 419 (1st Cir.1986) (same), and plaintiffs have offered no contrary authority.

The only possibility is that a property interest was somehow created through a *de facto* reappointment system in which the University, by "custom or policy," vested in the plaintiffs a legitimate claim of entitlement through a mutually explicit understanding. For instance, in *Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Supreme Court held that an untenured professor who had worked for ten years at a college that did not have a formalized tenure system might be able to show a property interest based upon a *de facto* tenure policy. There the plaintiff relied on "an unusual provision" in the Faculty Guide in which the college expressed its wish for each faculty member to "feel that he has permanent tenure as long as his teaching services are satisfactory ..." *Id.* at 600, 92 S.Ct. at 2699.

In today's case, though, it is not immediately clear whether plaintiffs have raised a genuine issue of material fact on this issue. Colburn's only evidence on this question is his testimony that he believed he had the opportunity for permanent employment as long as he achieved certain levels of professional achievement. A review of Khoury's deposition shows that he had an "understanding that if my performance was rated satisfactory that my appointment would last at least until the end of my probationary period and through may review for

tenure, so that would be a period of six years." He adds that he was "assured" that his employment would "continue through [the] probationary period" if his "performance was satisfactory," and that there was an "understanding" that "reappointment decisions are fairly automatic for employees on tenure track positions."

The courts, however, have been hesitant to find property rights in this context where there are already formalized policies in place. As the First Circuit, has written:

> Where a college or university has a written, formalized tenure procedure, courts have generally rejected claims that a plaintiff has somehow acquired de facto tenure or a legitimate expectation of continued employment outside of and apart from the codified process. This is because one of the very purposes of formalizing hiring procedures is to avoid the type of de facto tenure recognized in *Perry*.... Consequently, when there is a written system of which the employee is aware, it generally will not be reasonable for the employee to rely on employment assurances made outside of the formalized system.

*Lovelace v. Southeastern Massachusetts Univ.*, 793 F.2d 419, 423 (1st Cir.1986).

The Seventh Circuit has expressed similar concerns, writing in *Eichman* that "[w]hile we will not now say that there could never be a case in which a university had a *de facto* tenure policy on which faculty could justifiably rely which was inconsistent with a codified tenure plan, we agree with the district court that nothing in this record suggests that ... a right to reappointment [exists]...." *Eichman*, 597 F.2d at 1109. This was so because "[a] merely subjective and unilateral expectancy is *not* protected by due process." *Davis v. City of Chicago*, 841 F.2d 186, 188–89 (7th Cir.1988) (emphasis in original). Instead, "[i]t must be established that the custom was indeed practiced." *Id.*

■ In today's case, however, unlike in *Eichman,* there is some evidence in the record supporting the claim to a custom of *de facto* reappointments during the probationary period. When taking the plaintiffs' evidence favorably for them on this motion for summary judgment, reasonable inferences can be drawn that the custom existed and was indeed practiced. Plaintiffs testified that they were "assured" of reappointment if their performance remained satisfactory, and the testimony that such reappointments were "fairly automatic" can support a finding that such a custom was practiced. Plaintiffs' evidence on this issue at this stage is weak, but it appears to be just enough to get them past summary judgment. *Cf., Shannon v. Bepko*, 684 F.Supp. 1465, 178–79 (S.D.Ind.1988) (Judge Barker holds that summary judgment on "mutual understanding—common law property interest" issue was inappropriate).

Although plaintiffs would no doubt need more and better evidence to persuade a trier of fact to find for them on this issue, it seems that, with the evidence they have put forth at this juncture, they have raised an issue of material fact. Accordingly, although summary judgment must be granted on the reappointment claim under the contract itself, summary judgment is denied on the issue of whether there was a mutually explicit understanding that reappointment would be granted during the probationary period if performance were satisfactory.

#### b. promotion

■ Plaintiffs also claim a property interest in being promoted to the rank of Associate Professor. The success of this claim turns squarely on the language of the Handbooks that is incorporated into the plaintiffs' contracts, for there is no evidence in the record speaking to any "mutually explicit understanding" regarding promotions.

Unlike in the reappointment context, the Faculty Handbook does include a section on "Criteria For Promotion," which begins with the following proviso: "Teaching, research and creative work, and services which may be administrative, professional, or public are long-standing University promotion criteria." However, the promotion considerations are to take in account "differences in mission between campuses, and between schools within some campuses, as

well as the individual's contribution to the school/campus mission." As a result, the "relative weight attached to the criteria above should and must vary accordingly."

The Handbook further provides that a "candidate for promotion should normally excel in at least one of the above categories and be satisfactory in the others." Moreover, "[p]romotion to any rank is a recognition of past achievement and a sign of confidence that the individual is capable of greater responsibilities and accomplishments."

The Handbook then adds that "[f]avorable action should result when the individual has demonstrated a level of competence or distinction appropriate to the proposed rank in one area of endeavor." "Failure to promote may arise from unsatisfactory performance in the other areas." The Department of Sociology's own By–Laws have similar criteria for promotion.

The Handbook also provides criteria for each step in rank, and for a promotion from Assistant Professor to Associate Professor, the "advancement is based on continued improvement, whether in quality of teaching, in scholarship, or in the performance of service roles."

The question, then, is whether the plaintiffs had a legitimate claim of entitlement to a promotion based on these criteria. A review of these standards shows that promotion "should result" when the applicant has shown competence or distinction in one area of teaching, research, or service, while failure to promote may arise from "unsatisfactory performance" in any of the three areas.

At first glance, these "criteria" would seem to limit the decisionmakers' discretion in such a way as to suggest the existence of a property interest, for if an Assistant Professor shows "continued improvement" in one of the three areas, "favorable action should result." The case law in this area, however, has, with one exception, been unequivocally proemployer in the promotion context.

For instance, in *Gaballah v. Johnson*, 629 F.2d 1191 (7th Cir.1980), the Seventh Circuit held that an employee had no prop-

erty interest in a promotion because the promotion rules established by the employer were "general policy guidelines" that created "no personal rights." *Id.* at 1203. Similarly, in *Bigby v. City of Chicago*, 766 F.2d 1053 (7th Cir.1985), the Seventh Circuit, in rejecting a property interest claim in the promotion setting, wrote that there is "no 'right' to a good efficiency rating from one's superior; rating is an exercise of the superior's discretion." *Id.* at 1056. *See also United States v. City of Chicago*, 869 F.2d 1033, 1037 (7th Cir.1989) (noting that candidates for promotion have no legal right to a favorable performance rating because subjective factors are involved); *Burns v. Sullivan*, 619 F.2d 99, 104 (1st Cir.1980) (where promotion was based on subjective factors, property interest did not exist).

The *Bigby* panel also noted that in the facts presented in that case, "Promotion to lieutenant's rank [wa]s not a matter of right and [wa]s not governed by fixed rules which if complied with automatically entitle the applicant to promotion." *Bigby*, 766 F.2d at 1057. The Seventh Circuit thus seemed to indicate that no property interest arises in the promotion setting unless the applicant can point to "fixed rules" that, if satisfied, would make the promotion automatic.

Here, although the promotion criteria are fairly specific, there is again no guarantee that an Assistant Professor will be promoted. First, an employer's evaluation of the performance of an employee, as the Seventh Circuit and other circuits have noted, is in part a subjective matter. Second, the Handbook states that favorable action "should" result if certain standards are met; the Handbook does not say "shall," "will," or "must." Although the word "should" is the preterite tense of "shall," it does not express the same imperative or mandatory meaning as "shall." Indeed, although the word "should" ordinarily implies "duty or obligation," it is usually no more than an obligation of propriety or expediency, and it "does not ordinarily express certainty as 'will' sometimes does." *Black's Law Dictionary* (5th ed. 1979).

Case law supports this construction of the term. For instance, in *University of South Florida v. Tucker*, 374 So.2d 16, 17 (Fla.App.1979), the court wrote, "Use of the word 'should' indicates to us that the procedure for resignations is discretionary rather than mandatory in nature." *Accord, Starks v. Kentucky Health Facilities*, 684 S.W.2d 5, 7 (Ky.App.1985). Similarly, in *Roanoke Memorial Hospitals v. Kenley*, 352 S.E.2d 525, 529 (Va.App.1987), the Virginia Court of Appeals held that the use of this term "was intended to confer an appropriate amount of discretionary authority in the administrative body."

Although plaintiffs have not cited a single case in which a property interest was found in the promotion context, the Court has located one decision that supports their position. In *McIntosh v. Weinberger*, 810 F.2d 1411 (8th Cir.1987), *vacated on other grounds* 487 U.S. 1212, 108 S.Ct. 2861, 101 L.Ed.2d 898 (1988), the Eighth Circuit held, without detailed discussion, that government employees had a property interest in a detailed merit-promotion system. The full extent of that holding is as follows:

> Of course, absent statutes, regulations, or some other basis for such a legitimate claim of entitlement, government employment and promotion decisions are normally not subject to procedural due-process protections. *See, e.g., Colm v. Vance*, 567 F.2d 1125, 1130 (D.C. Cir.1977) (Foreign Service officer had no property interest in promotion). Here, however, extensive OPM, Army, and ALMSA regulations were in effect [and]

... provided the plaintiffs with a substantial, legitimate expectation by establishing that applications for competitive placement ... were to be evaluated in accord with specified criteria and procedures. * * * We therefore hold that the plaintiffs had a property interest in ALMSA's merit-promotion system....

*McIntosh*, 810 F.2d at 1433–34.

This case, however, does not carry the day when balanced with the weight of authority finding no property interest in promotions and when the text of the promotion criteria are closely examined. Indeed, the *McIntosh* decision does not disclose what was contained in the specified criteria; it may well be that the Army regulations stated that promotion was guaranteed upon satisfying certain objective criteria. Moreover, although the University would be free to do so if it chose, it would be unusual for the University to create a property interest in promotion when it has not done so for reappointment in its Faculty Handbooks.

In summary, although resolution of this issue is not as simple as defendants would suggest, the Court concludes that plaintiffs do not have a property interest in being promoted. The criteria in the Handbook invoke subjective decisions and do not make a promotion automatic upon satisfying certain standards, and the weight of the promotion decisions from the Seventh Circuit and other courts show that property interests are difficult to establish in this setting.[10] Accordingly, summary judgment is granted for the defendants on this issue.

---

**10.** It seems that criteria such as those presented in today's promotion context might be treated as sufficient by courts in the dismissal context. A review of the promotion and tenure cases shows that the courts are particularly reluctant to find a property interest in these settings, often pointing to things such as the subjective nature of the criteria as rationale (as the Seventh Circuit has done and as this District Court does today in following the Seventh Circuit). However, the criteria used in the dismissal setting such as "for cause only" seem to be equally subjective.

Perhaps the real (but unexplained) distinction is that in the promotion setting, the employee has not yet been vested with the government benefit, whereas in the dismissal setting, the employee already has the job and will be more adversely affected by the loss of the government entitlement. This type of analysis, which is used in the political patronage "equivalent to a dismissal" First Amendment claims, *see Rutan v. Republican Party of Illinois*, 868 F.2d 943 (7th Cir.1989) (*en banc*), *cert. granted,* — U.S. —, 110 S.Ct. 48, 107 L.Ed.2d 17 (1989), could well be creeping into the property interest jurisprudence. *See Farkas v. Ross–Lee*, 727 F.Supp. 1098, 1103 (W.D.Mich.1989) ("In the context of public academic employment, courts applying procedural due process analysis to alleged property rights have distinguished between terminations and lesser personnel actions"). Whether that is actually happening, and whether it is appropriate, are not proper subjects of this district court opinion.

### c. tenure

The final claim to a property interest is in being granted tenure. The validity of this claim must also turn on the language of the contracts and the incorporated Handbooks and policies, for there is no evidence of any other mutually explicit understanding on this matter.

The Handbook contains a brief section entitled "Criteria For Tenure," which is reprinted in full below:

> After the appropriate probationary period, tenure shall be granted to those faculty members ... whose professional characteristics indicate that they will continue to serve with distinction in their appointed roles. The criteria for tenure and the criteria for promotion are similar, but not identical. Tenure considerations must take into account the mission of the particular unit and the individual's contribution to that mission. Tenure will generally not be conferred unless the faculty member ... achieves, or gives strong promise of achieving, promotion in rank within the University.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Subject to the provisions [of this Handbook], an individual appointed to the faculty ... for full time service shall have tenure after a probationary period of not more than seven years.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> All of the ... principles, policies, and procedures relating to tenure are applicable in all University schools [and] departments....

The question is thus whether these criteria vested plaintiffs with a legitimate claim of entitlement.

 It is immediately clear that the paragraph above stating that an individual "shall have tenure after ... not more than seven years" does not create a property interest because this paragraph specifically states that it is subject to the other provisions dealing with tenure. Rather, this provision simply provides the point in time at which a probationer is to be considered for tenure. *Accord, Beville v. South Dakota Bd. of Regents,* 687 F.Supp. 464, 466 (D.S.D.1988).

 As to the other "criteria," it must again be concluded that, while the standards appear to limit the decision-makers' discretion, the tenure decision remains one of discretion. Although the tenure criteria state that "tenure shall be granted to those faculty whose professional characteristics indicate that they will continue to serve with distinction," the criteria also indicate that tenure "will generally not be conferred unless the faculty member achieves or gives strong promise of achieving [a] promotion...." Thus, tenure is dependent in part on promotion, and where there is no guarantee of promotion, there can likewise be no guarantee of tenure.

Moreover, other than the *Perry v. Sinderman* line of *de facto* tenure cases which is not applicable here, this Court has been unable to locate a single decision finding a property interest in tenure. The most analogous case is *Beitzell v. Jeffrey,* 643 F.2d 870 (1st Cir.1981), where the First Circuit rejected a similar claim made by a university professor. The First Circuit explained the difficulties plaintiffs face in these cases, and the court's discussion is worthy of lengthy quotation here:

> [I]t [is not] surprising that every court that we have found to have considered the matter has held that, in the absence of unusual circumstances, a probationary university employee has no 'property' interest in obtaining tenure. Tenure involves a long-term academic and financial commitment by a university to an individual, providing faculty with unusually secure positions tantamount to life contracts. This security and the freedom of expression it allows, arguably

---

The Court merely notes that while it must follow precedent and rule against the plaintiffs on this issue, the plaintiffs certainly have legitimate legal arguments to make. Moreover, in the future the University might be well advised *to make it absolutely clear in its Handbooks and*

policies that such decisions are discretionary and that there is no right or guarantee of promotion as the University of Illinois, for instance, has done. *See McElearney v. University of Illinois,* 612 F.2d 285 (7th Cir.1979).

help the university carry out a basic function—the vigorous exchange of ideas—a function that itself enjoys constitutional protection. Given the university's overall mission, the creation and transmission of knowledge, the very need for strong procedural protections to prevent the wrongful dismissal of a tenured teacher concomitantly suggests a need for wide discretion in making an initial tenure award. Only at the initial tenure stage can the university look primarily to the interests of the students, of the discipline, and of its own administrative needs. As other courts have suggested, the initial decision to grant tenure, like various other academic matters, typically calls for the exercise of subjective judgment, confidential deliberation, and personal knowledge of both the candidate and the university community.

*Beitzell*, 643 F.2d at 875 (citations omitted).

The First Circuit also noted that the University of Massachusetts used the "classical" tenure requirements of scholarship, teaching, and service that are "most widely accepted" in the United States, *Id.* at 872 n. 1, and then explained why such criteria did not give rise to a property interest. Another full quotation is warranted:

> The district court [improperly] based its finding of a property 'entitlement' upon the ... promulgated criteria for a tenure award. But those criteria did not set objective standards conferring an automatic right to tenure, nor did they create a reasonable expectation of receiving it. Rather, they simply reiterated the traditional criteria of promotion at universities.... The government often promulgates criteria for selecting among applications for a particular job, but that fact alone does not create an automatic right in the applicant to the job, nor does it create an entitlement, or a property interest, in a job not yet possessed. Aside from the mere existence of these criteria, there is not a word in the record suggesting that ... 'tenure' was meant to be granted routinely or to be withheld only for 'cause', nor is there a word suggesting that the tenure procedure was meant

to be less judgmental or subjective than elsewhere.

*Beitzell*, 643 F.2d at 876.

This decision and other similar tenure cases from around the country simply preclude this District Court from finding a property interest. *See, e.g., Goodisman v. Lytle,* 724 F.2d 818 (9th Cir.1984) (professor had no property interest under formal tenure system as traditional guidelines provided "only an outline of relevant considerations"); *Staheli v. University of Mississippi,* 854 F.2d 121 (5th Cir.1988) ("The institution of tenure has an inexorable internal logic: the very existence of a tenure system means that those teachers without tenure are *not* assured of continuing employment"); *Dube v. The State Univ. of New York,* 900 F.2d 587 (2d Cir.1990) (professor has no property interest in tenure).

In the Seventh Circuit, professors have encountered similar difficulty in pressing these cases. For instance, in *McElearney v. University of Illinois,* 612 F.2d 285 (7th Cir.1979), the Seventh Circuit held that a professor at the University of Illinois had no property interest in obtaining tenure. Although the defendant in that case had gone so far as to specifically provide in its university statutes that there was no "guarantee or implication" that the university would renew the appointment even if the professor had performed satisfactorily, the decision still suggests that formal tenure systems do not confer property interests.

As the *McElearney* opinion states, "The entire thrust of formal tenure provisions is to standardize the process of faculty selection and employment security. "In other words, formal tenure regulations are designed to avoid the *de facto* tenure problem recognized in *Perry....*" *McElearney,* 612 F.2d at 291 (*quoting Haimowitz v. University of Nevada* 579 F.2d 526, 528 (9th Cir.1978)). *See also Upadhya v. Langenberg,* 834 F.2d 661 (7th Cir.1987) (tenure track professors at University of Illinois lacked property interest).

In short, the criteria for tenure do not sufficiently limit the University's discretion

in deciding who shall be granted tenure; there is simply no guarantee that anyone will obtain the "life-time contract." This does not mean that a college could not impose such limitations on its decision-makers so as to create a property interest. Rather, it is a mere recognition of the fact that Indiana University, apparently like most universities, has opted not to implement such a system. Although Indiana University's criteria, on the surface, appear to come closer to granting a property interest than those of the University of Illinois, they do not go far enough to help the plaintiffs here.

Accordingly, because there is no property interest in tenure under the plaintiffs' contracts, summary judgment must be granted for the defendants on this claim.

### 4. *The Process Received:*

Given that there is still a viable due process claim for non-reappointment based on a mutually explicit understanding, the next question is whether the plaintiffs received the process to which they were entitled. Because only the non-reappointment claims remain, the issue is whether plaintiffs did not receive due process in the non-reappointment decision.

"The due process clause of the fourteenth amendment guarantees that a person be given notice and an opportunity to be heard at a meaningful time and in a meaningful manner before being deprived of a significant protected property interest." *Cholewin v. City of Evanston,* 899 F.2d 687, 689 (7th Cir.1990). In determining whether such guarantees have been infringed, courts "look not to state law but to federal law with respect to the United States Constitution." *Becker v. Illinois Real Estate Admin. & Disciplinary Bd.,* 884 F.2d 955, 958 (7th Cir.1989). "Minimum procedural requirements are a matter of federal law[;] they are not diminished by the fact that the State may have specified its own procedures it may deem adequate for determining the preconditions to adverse official action." *Id.*

■ "Inherent in due process are the concepts of notice and opportunity to be heard prior to being deprived of a protected interest unless the state's interest in an immediate deprivation outweighs the individual's interest in a predeprivation hearing." *Id.* Three factors must be weighed in determining the nature of the process due in a given situation: (1) the nature of the private interest affected; (2) the risk of an erroneous deprivation together with the value of the imposition of additional procedural safeguards; and (3) the state's interest. *Id.*

■ In this case, an analysis of these three factors leads to the conclusion that a predeprivation opportunity to be heard was required. The private interest, that of being reappointed on the tenure track, is significant, and the risk of an erroneous deprivation is substantial given the very nature of the reappointment decision. Moreover, the value of additional safeguards is apparent, and the state's interests (keeping good teachers) would actually seem to be enhanced by such safeguards. *Accord, Becker,* 884 F.2d at 958.

This is in line with the Supreme Court's pronouncement that the " 'root requirement' of the Due Process Clause [is] ... 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.' " *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (*quoting Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) (emphasis supplied by *Boddie* Court)).

In this case, although it is clear that the plaintiffs received adequate notice prior to their deprivations as well as adequate explanations of the employer's evidence and rationale, the ultimate due process question is whether plaintiffs had an adequate opportunity to respond prior to the deprivation.

Although the "deprivation" occurred when each plaintiff learned of the final decision on non-reappointment in late April of 1985 (*see* discussion of when claims accrued *infra*), it is not clear what type of predeprivation opportunity to respond was

required. In *Loudermill,* the Supreme Court seemed to suggest that an actual hearing is not always mandated, but that "the opportunity to present reasons, either in person or in writing," might be sufficient. *Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1495. *See also Becker,* 884 F.2d at 958–59 (discussing what type of hearing is required); *Cholewin,* 899 F.2d 687, 689–90 (7th Cir.1990) (same).

Prior to ruling on this constitutional issue, the Court finds it appropriate and necessary to allow the parties an opportunity to further research this area and refine their arguments on this matter. The question to be addressed is what type of "opportunity to respond" the plaintiffs were entitled to prior to receiving final notice of the non-reappointment decision in late April of 1985.

### E. *Qualified Immunity:*

 It takes no great discussion to show that the individual defendants are entitled to qualified immunity from damages claims under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and its progeny. Under this doctrine, public officials performing discretionary functions are protected against suits for money damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Polenz v. Parrott,* 883 F.2d 551, 554 (7th Cir.1989). After *Harlow,* the analysis is purely objective, *Polenz,* 883 F.2d at 554; *Rakovich v. Wade,* 850 F.2d 1180, 1205 (7th Cir.1988) (*en banc*), and the district courts are to consider the legal issue of qualified immunity "at the earliest possible stage of litigation." *Anderson v. Creighton,* 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987). *See also* S. Nahmod, *Civil Rights and Civil Liberties Litigation* § 8.16 at 511 (1986) ("whether clearly settled law existed at the time a defendant acted is an issue of law for the court").

The methodology to be used has been set forth by the Seventh Circuit as follows:

Once the defendant's actions are defined or characterized according to the specific facts of the case this characterization is compared to the body of law existing at the time of the alleged violation to determine if constitutional, statutory, or case law shows that the now specifically defined actions violated the clearly established law.

*Rakovich,* 850 F.2d at 1209. The question is thus whether, at the time the alleged actions took place and in the particular factual context presented, "there was a substantial consensus of opinion that [such] a course of conduct infringed on a right protected by the Constitution." *Doe v. Bobbitt,* 881 F.2d 510, 511 (7th Cir.1989). Such a standard protects all but the "plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

 In the specific factual context of this case, because it was not clearly established at the time of the defendants' actions that speech concerning a personnel-oriented review committee was protected as a matter of public concern, the individual defendants are entitled to qualified immunity on the First Amendment claims. Similarly, because it was not clearly established that professors at Indiana University had a property interest in being reappointed, promoted, or granted tenure, qualified immunity is also applicable to the due process claims. Accordingly, summary judgment is granted to the defendants on the qualified immunity issue.

 It must be emphasized, however, that this defense is only available for civil damages claims, *Conner v. Reinhard,* 847 F.2d 384, 387 (7th Cir.1988), and thus does not cover any claims for injunctive relief. *See also Lenea v. Lane,* 882 F.2d 1171, 1178–79 (7th Cir.1989); *Scott v. Lacy,* 811 F.2d 1153, 1154 (7th Cir.1987).

### F. *Statute of Limitations:*

Defendants next assert that the civil rights claims are time barred. Again, only the reappointment due process claims re-

main and need to be considered in this context.

■ All claims under 42 U.S.C. § 1983 are characterized for statute of limitations purposes as actions to recover damages for injuries to the person. *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Springfield Township School District v. Knoll*, 471 U.S. 288, 105 S.Ct. 2065, 85 L.Ed.2d 275 (1985). In Indiana, the borrowed limitations period is two years pursuant to *Indiana Code* § 34–1–2–2. *See Dinger v. City of New Albany*, 668 F.Supp. 1216, 1217 (S.D.Ind.1987); *Ross v. Summers*, 630 F.Supp. 1267, 1269 (N.D.Ind. 1986). The Complaint in this action was filed on April 21, 1987. Thus, the applicable "federal" statute of limitations cut-off date borrowed from Indiana law is thus two years prior on April 21, 1985.

■ It is settled that any questions of tolling and application of this statute of limitations are matters of Indiana law. The Supreme Court made this clear in *Wilson*, writing, "[T]he length of the limitations period, and closely related questions of tolling and application, are to be governed by state law." *Wilson*, 471 U.S. at 269, 105 S.Ct. at 1943; *Accord, Board of Regents v. Tomanio*, 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980); *Hollins v. Yellow Freight System, Inc.*, 590 F.Supp. 1023, 1026 (N.D.Ill.1984).

However, the issue of when the cause of action accrues is a matter of federal law. *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Kessler v. Board of Regents*, 738 F.2d 751, 754 (6th Cir.1984); *Riordan v. City of Lakewood*, 891 F.2d 292 (6th Cir.1989). One commentator has explained the rationale behind this rule, writing, "This makes sense because the question of when all of the elements of a § 1983 cause of action are present ought to be a question of federal law." S. Nahmod, *Civil Rights and Civil Liberties Litigation* § 4.15 at 254 (2d ed. 1986).

Thus, the question here is whether Colburn or Khoury's cause of action for violation of their due process rights relating to non-reappointment accrued before April 21, 1985, under federal law. In determining when an action accrues, the federal courts "focus ... on the time of the ... *act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981) (emphasis in original). "[I]t is only necessary for the plaintiff in an employment situation to be effectively notified of a discharge for the cause of action to accrue at the time of notification." Nahmod, *Civil Rights Litigation* § 4.17 at 262.

The evidence on this matter is as follows. Colburn's non-reappointment began with a negative recommendation in the Primary Committee on February 15, 1985. On March 26, 1985, Chairperson Hope informed Colburn that he was recommending to Dean Plater that Colburn not be reappointed. On April 1, 1985, Plater informed Colburn that he concurred with Hope and that he had forwarded the non-reappointment recommendation to the Dean of Faculties. Then, on April 23, 1985, Colburn received a letter from Vice President Irwin stating that it was the "University's official notice of non-reappointment...."

Colburn thereafter sought and obtained review from the Faculty Board of Review. This non-binding review process did not culminate until December 4, 1985, when the Board made its recommendation that Colburn be given a two-year terminal appointment. Colburn then sought review from President and Trustees of the University. This review concluded on June 30, 1988, when Executive Vice President Pinnell wrote Colburn stated that the decision of non-reappointment was being affirmed.

■ Applying the law to these facts, it is seen that Colburn's cause of action for non-reappointment accrued on April 23, 1985, when he received the April 22, 1985, official notice of the non-reappointment decision from the University through Vice President Irwin. This is within the two year limitations window of April 21, 1985, so the action on non-reappointment is timely.

Although Colburn no doubt had good reason prior to that time to believe that he would not be coming back, all the prior "decisions" of the Committees, Department Chairs, and Deans were mere recommendations. While Colburn probably suspected the non-reappointment decision was coming, it had not yet been finally made until the Board of Trustees' representative, Vice President Irwin, made it official. If Colburn had filed this § 1983 action prior to learning of the final decision, say, on April 20, 1985, the action would not yet have been ripe. *Accord Cohen v. Board of Educ. of East Ramapo Cent. School,* 536 F.Supp. 486, 492–93 (S.D.N.Y.1982) (cause did not accrue until plaintiff was notified of Board of Education's formal action). Thus, Colburn's claim did not accrue prior to April 23, 1985, and his § 1983 claim relating to his non-reappointment is timely.[11]

As to Khoury's claim, the record shows that by letter dated January 15, 1985, Dean Plater informed Khoury that he was recommending to the Dean of Faculties that Khoury not be reappointed. A letter dated April 12, 1985, from Vice President Irwin is entitled "Official Notice of Non-reappointment." This letter states that it is Irwin's obligation on behalf of the University to inform Khoury that "the decision has been made that you will not be reappointed...." The letter also states that it "constitutes the University's official notice of non-reappointment required to be given under its rules."

Based on this letter, defendants argue that Khoury's claim is time barred because it precedes the April 21, 1985, cut-off date. In response, plaintiff's counsel asserts that page 272 of Khoury's deposition shows that the letter was not received until within the limitations period. (Brief at 24). In their subsequent Reply Brief, however, defense counsel press their argument, writing, "It is also undisputed that Khoury received notification of the recommendations outside the statute of limitations period." "The last word he received on his ... reap-

pointment was outside the statute of limitations." (Reply Brief at 19).

A review of pages 271 and 272 of Khoury's deposition testimony, however, shows that this is *not* "undisputed" as defense counsel claims. To the contrary, the record reveals the following:

Q. (presumably from defense counsel) Did you know prior to April 12, 1985, that you would not be reappointed ...?

A. No.

Q. This was the first time you knew about it?

A. Knew that I would not be reappointed?

Q. Right.

A. Yeah. In fact, I didn't know even on April 12, because this document wasn't received by me until much later in April. I don't know if you've seen this, but this document, of course, has to pass through proper administrative channels before it reaches me, and by the time it reached me it was sometime after.

Q. When did you receive it?

A. I'm not sure, but it couldn't have been earlier than April 25th.

Q. Why do you say that?

A. Oh, I'm sorry, here it is. Because on April 18th it was in Hope's office. My notice of non-reappointment was transmitted through channels to him. He had it on April 18th, and the earliest— the earliest possible time it could have reached me is one week later, because I'm stationed in Columbus.

Q. Did you ever receive things in less than a week that originated in the IU Indianapolis campus?

A. Never. Sometimes it took years.

*See* Khoury Deposition at 271–272.

Thus, far from being undisputed, it is absolutely clear from the record that there is a question of fact on the issue of when Khoury received the "last word" on his non-reappointment. Accordingly, summary judgment must be denied on this issue.[12]

---

**11.** It must be noted that Colburn's actions in appealing the decision through the Faculty Board of Review and beyond do not affect the date his claim accrued. *See Ricks,* 449 U.S. at 258, 261, 101 S.Ct. at 504, 505 (utilization of grievance procedure or some other method of

collateral review does not affect the date of accrual); *Kessler,* 738 F.2d at 754 (same).

**12.** In light of the number of issues involved in this case and the amount of evidence to be

## G. *Pendent State Law Claims:*

 The bulk of plaintiffs' pendent State law claims for breach of their employment contracts must fail. For the same reasons discussed previously in this opinion, plaintiffs had one year definite term contracts. Plaintiffs were not discharged during the term of any contract, so that aspect of their contract law claims must fail. In short, the one year contracts were fulfilled.

Plaintiffs still have a viable claim, however, for the existence of an implied contract for reappointment. This parallels the mutually explicit understanding claim set forth previously in this opinion. The parties shall proceed to develop this issue. *See Shannon v. Bepko,* 684 F.Supp. at 1479 (discussing implied contract theory and leaving it to parties to further develop the matter).

 Even if plaintiffs can prevail on this narrow claim, however, it is clear that the individual defendants would not be liable on the implied contracts. There is no evidence in the record from which it can be concluded that the individual defendants were parties to any such contract, and plaintiffs now concede as much. Moreover, as defendants correctly point out, the individual defendant-agents cannot be held liable on a tortious interference with contract theory because the evidence unequivocally shows that they were acting within the scope of their employment. *Kiyose v. Trustees of Indiana University,* 166 Ind. App. 34, 333 N.E.2d 886, 890–91 (1975) (university trustees acting in official capacity in terminating a professor could not be liable for interference with contract because agents acting in the scope of employment are not liable under this theory of tort).

Accordingly, summary judgment is granted in part and denied in part on the pendent state law claims.

considered, the Court will presume that this was an innocent oversight by defense counsel. The fact that plaintiffs' counsel pointed this page out in their response brief could suggest otherwise, but plaintiffs did not go so far as to quote from or summarize this testimony. Indeed, given the number of such "casual" citations to the record by plaintiffs in their response brief, it cannot be presumed that defense counsel (or the Court, for that matter) would check all of them. *See* Local Rule 11. Nonetheless, defense counsel was at the deposition and should have remembered this crucial testimony. *See Goka v. Bobbitt,* 862 F.2d 646 (7th Cir.1988) (Seventh Circuit reverses summary judgment and orders sanctions to be considered where counsel presumably had knowledge of genuine issues of material fact through deposition testimony).

## I. *Section 1986 Claims:*

Plaintiffs now concede that they make no claims under § 1986. Thus, the reference to § 1986 in the Complaint is inadvertent. Accordingly, summary judgment is granted for the defendants on any § 1986 claims.

## IV. CONCLUSION:

In summary, the Court is without jurisdiction over the damages claims against the Trustees and the official capacity defendants by virtue of the Eleventh Amendment. Moreover, although the Court need not decide this issue, it appears that these defendants are not suable "persons" under § 1983 in damages actions. Additionally, the individual defendants are entitled to qualified immunity from damages on all the federal claims.

The plaintiffs' speech concerning the Primary Committee, while no doubt important to them, did not relate to a matter of public concern and was not protected under the First Amendment. Defendants are entitled to summary judgment on this issue.

As to the Due Process claims, plaintiffs have failed to raise a genuine issue of material fact that they had a property interest in being promoted or obtaining tenure. They also cannot prevail on their non-reappointment claim under their written contract and the Handbooks, but have raised an issue of fact as to whether there was a mutually explicit understanding that reappointment would be automatically granted if certain objective standards were met. The plaintiffs' state law claims also fail, with the sole exception of the implied contract reappointment claim.

The record shows that Colburn's non-reappointment claim is not time barred as a matter of law. The timeliness of Khoury's non-reappointment claim is a question of

fact as there is a factual dispute as to whether he received the final decision prior to April 21, 1985.

Summary judgment is thus GRANTED IN PART and DENIED IN PART. The majority of plaintiffs' claims do not survive summary judgment. Both plaintiffs have one remaining federal and state claim at this juncture. Should plaintiffs prevail on their remaining claims, the available relief would be in the form of reinstatement as tenure-track appointees with one year definite term appointments; there would be no guarantee of promotion or tenure even if plaintiffs won every aspect of the remaining claims. Pursuant to Rule 54(b), the Court finds that there *is* just reason for delay in entering judgment. Accordingly, the Clerk is directed *not* to enter a Rule 58 judgment on a separate document at this time. Today's order is thus not an appealable order at this time.

The Court further ORDERS that the parties' attorneys shall appear before the undersigned for a conference of attorneys on Thursday May, 24, at 2:00 P.M., in Room 330, U.S. Courthouse, Indianapolis, Indiana. Counsel shall be prepared to discuss all remaining aspects of this case. The parties or their agents having full authority shall be available for immediate phone consultation in case it becomes necessary.

The Court further ORDERS that all prior scheduling orders and trial dates are vacated. Discovery is temporarily stayed until the the conference of attorneys. The Court will establish a final scheduling order and trial date at the upcoming conference. The Court also HOLDS IN ABEYANCE the Motion to Strike Jury Demand, and will discuss this motion at the conference of attorneys.

IT IS SO ORDERED.